IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GUY T. STRINGHAM,

        Plaintiff,             No. CIV S- 05-0644 FCD GGH P

    vs.

J. BICK, et al.,

        Defendants.         FINDINGS AND RECOMMENDATIONS

_____/

Introduction

        Plaintiff, a state prisoner proceeding pro se, seeks relief pursuant to 42 U.S.C. § 1983.  Pending before the court is plaintiff's May 25, 2006, "emergency" motion for a preliminary injunction.

Amended Complaint

        In his underlying allegations, plaintiff is proceeding against ten defendants[1] in an amended complaint (AC), filed on September 16, 2005.[2]  The defendants are the California Department of Corrections and Rehabilitation (CDCR); California Medical Facility-Vacaville

_____

[1] Two defendants have been dismissed from this action.  See Order, filed on May 16, 2006.

[2] The original complaint was filed on April 4, 2005.

1

1   (CMF);[3] J. Bick; T. Donahue; R. Andreason; N. Khoury; J. Thomas; S. Murray; S. Moreno; T.

2   Schwartz.

3           Plaintiff contends that he was issued one CDC 128-C medical chrono for cell

4   housing with window tint on October 16, 2000, settling a grievance filing by plaintiff.

5   Thereafter, the cell housing and window tint matters were divided into separate chronos; medical

6   chronos, pursuant to CMF policy are valid for one year and thus must be renewed annually.

7   Plaintiff filed two separate grievances when the medical chronos were not renewed.  AC, p. 7.[4]

8           On May 16, 2001, after plaintiff had been moved to a cell where he was allowed

9   to use window tint, staff ordered that he uncover his cell windows contrary to his medical

10  chrono.  AC, p. 8.  On January 30, 2004, following dismissal of a prior action on the same matter

11  for failure to exhaust administrative remedies, Case No. Civ-S-01-1211 WBS DAD P, plaintiff

12  filed a grievance with respect to cell housing reviewed by defendant CMF Senior Medical

13  Technical Assistant (MTA) T. Donahue, and denied by defendant CMF-V Chief Medical Officer

14  (CMO) J. Bick.  At the second level, plaintiff's grievance was reviewed by defendant R.

15  Andreason, also, apparently, CMO at CMF, according to plaintiff, and denied by defendant N.

16  Khoury, Chief Deputy of Clinical Services.  AC, p. 9.  At the third level, N. Grannis did not

17  review the appeal "due a time constraint pretense."[5]

18          After the grievance processes within CDCR and the Board of Control were

19  complete, defendant Correctional Sergeant S. Murray moved plaintiff to a dormitory bed on

20  December 17, 2004, placing plaintiff in view of large exterior windows and exposing him to

21  large fluorescent lights from 5:00 p.m. to 11:30 p.m.  This exposure caused plaintiff to suffer

22

23          [3] Plaintiff proceeds against the entity defendants solely on his claims pursuant to the
    Americans with Disabilities Act (ADA).  See Order, filed on March 15, 2006, n. 1.

24

25          [4] Only the court's electronic pagination is referenced.

26          [5] Allegations with respect to N. Grannis and M. Cry will not be referenced further, as
    these parties have been dismissed from this action.

1  several migraine headaches until he was moved to a different dorm bed on January 27, 2005.

2  AC, p. 10.

3          Plaintiff's new location, where he remained at the time of the filing of his

4  amended complaint, placed him directly before the middle of a large exterior window, causing

5  him numerous migraine headaches.  AC, pp. 10-11.

6          Plaintiff's neurologist, Dr. Cappazoli, not a defendant, had prescribed

7  Zolmitriptan, apparently for plaintiff's migraines, but the prescription had lapsed because

8  plaintiff did not need it while plaintiff had been housed in a cell with tinted windows.  When

9  plaintiff tried to obtain Zolmitriptan, after the prescription had been renewed as of December 16,

10 2004, it was not made available to him until February 1, 2005.  AC, p. 11.

11         On January 27, 2005, the day plaintiff moved to the second dorm location, P-139-

12 L, defendant S. Moreno, CMF Unit 1 Facility Captain, ordered the Unit 1 staff to keep the dorm

13 lights on from 8:00 a.m. until 10:00 p.m., for institutional safety and security purposes.  This

14 completely deprived plaintiff of the ability to avoid all brightly lit areas.  Id.  When plaintiff

15 attempted to address his medical problem informally, defendant Bick apparently failed to review

16 plaintiff's medical file because in his written response, he stated wrongly that the issue did not

17 implicate the ADA.  Plaintiff's Type I ("brittle") diabetes and visual light inability or impairment

18 are conditions limiting plaintiff's major life activities covered by the ADA.  AC, pp. 11-12.  His

19 visual light impairment has been recognized as an ADA disability in his records since April 5,

20 2000.  AC, p. 12.

21         Plaintiff states that a copy of a May 25, 2005, CDC-128-C medical chrono

22 (Exhibit (Exh.) 31 to AC, p. 126) was brought to defendant Thomas, who thereafter refused to

23 move plaintiff to a cell, thus showing deliberate indifference to plaintiff's serious medical

24 condition.  Id.  The text of the copy of the chrono plaintiff attaches,[6] containing signatures by

25

26         [6] The court notes that defendant Bick, in response to plaintiff's motion, has attached, inter alia, a copy of this identical chrono as part of attachment 2, p. 13, to his declaration.

3

3e0b474763e363e2

both Dr. Capozzoli and defendant CMO Bick, states:

> I would recommend that Mr. Stringham be provided with cell housing (single cell housing not required).  Mr. Stringham has diabetes with severe neuropathy involving also autonomic neuropathy affecting his bowel and bladder control.  Additionally, he has diabetic retinopathy and vascular headaches with photophobia.  Mr. Stringham has a chrono which permits him to wear dark glasses and cover his cell windows with tinting material for the above diagnoses.  He is also wheelchair dependent as a result of his neuropathy.  For all of the above reasons, I recommend that he be allowed to live in a cell rather than a dorm environment, which is less conducive to accommodating his above-mentioned medical needs.  This chrono is valid for one year (through May 15, 2006), subject to annual renewal and to custody and institutional safety requirements.

AC, pp. 12-13, 126.  (It appears in the copy of the exhibit showing both signatures of Dr. Capozzoli and defendant Dr. Bick that defendant CMO Bick has also underlined and initialed the last five words of the chrono referencing safety requirements).

When plaintiff informed Dr. Capozzoli that the chrono did not get him moved to a cell on July 13, 2005, Dr. Capozzoli noted in plaintiff's medical file that he told plaintiff he should appeal the decision "since it was a medical recommendation based on his diagnosis & that it was a strong recommendation that I would support if asked to by the committee."  AC, p. 13 & Exh. 32 at p. 127.

Plaintiff points to various exhibits demonstrating his need for cell housing because he is unable to safely navigate a dorm environment due to, inter alia, "severe sensorimoto polyneuropathy" or numbness in his feet, and "right Charcot joint" or "Charcot foot."  AC, p. 13, Exhs. 1 - 6, 17-19, 26-29, at pp. 96-101, 112-114, 121- 124.

Plaintiff claims that dorm housing has not allowed for safe passage of his wheelchair between lockers and bunk beds and that his lack of immediate toilet access in a dorm, which he has to share with up to eleven other inmates, has caused him episodes of pain and suffering.  AC, p. 14.

\\\\\

1    Plaintiff cannot safely operate his wheelchair in the dorm, requiring that he walk

2  some 25 feet to the restroom, numerous times during the day and night, without handrails,

3  causing him to lose his balance and stumble into bunk beds and lockers.  AC, pp. 14, 18-19.

4    Plaintiff alleges that after he had been allowed window tint for four years,

5  defendant Bick inexplicably refused to approve plaintiff's window tint needs in March of 2004,

6  thus facilitating the staff's moving plaintiff to a dorm.  When, in February of 2005, defendant

7  Bick reversed himself and approved plaintiff's access to window tint (AC, Exh. 29, p. 124),

8  plaintiff had been placed in a dorm for three months and custody staff refused to move him into a

9  cell where he could make use of window tint.  AC, p. 15.

10    Plaintiff's headaches, which arise daily from his exposure to and intolerance of

11  light, lead to at least two migraines a week, and have occurred since his December 17, 2004,

12  move to a dorm.  Defendants are aware of plaintiff's inability to tolerate light but are deliberately

13  and callously indifferent to his serious medical needs in violation of his rights under the Eighth

14  Amendment.  AC, pp. 15-16.

15    Defendants' assertion (AC, Attachment 2H p 66) that plaintiff's light intolerances

16  can be ameliorated with dark glasses is untrue because plaintiff requires prescription lenses and

17  the dark glasses do not fit well enough to block intolerable peripheral light; defendants'

18  representation that the dark glasses can fit over plaintiff's prescription glasses runs counter to the

19  manufacturer's instructions.  AC, p. 17.   Moreover, plaintiff asks why, if plaintiff can be

20  otherwise adequately accommodated, he has been issued two subsequent chronos for tinted

21  windows.  AC, p. 17, Exhs. 29, 31 at pp. 124, 126.

22    In addition to alleging that defendants have violated his rights under the Eighth

23  Amendment, he also claims that he is totally medically disabled with regard to his need for an

24  orthotic brace with cane, wheelchair and crutches, that he is disabled under the ADA, 42 U.S. C.

25  §§ 12101, et seq., with respect to his Type 1 brittle insulin-dependent diabetic condition, with

26  secondary medical complications as well as his headaches.  AC, pp. 20-21.  Plaintiff alleges that

defendants are aware of his disabilities, provided accommodations for them for years, but now refuse to do so.  AC, p. 21.  Plaintiff seeks permanent injunctive relief under the ADA against the entity defendants in the form of being placed in cell housing for the remainder of his prison term; that he be allowed to affix window tint to exterior cell windows; that he maintain his dark eyeglasses as needed.  Plaintiff seeks money damages from the individual defendants.

Motion for Preliminary Injunction

Plaintiff seeks preliminary injunctive relief in the form of the permanent injunctive relief sought by this action, during the pendency of this case.  Plaintiff avers that, notwithstanding the CDC Medical Chronos (Exhs. 1-4, 6, 14, 31) he has attached to his motion, which largely track (or duplicate) the exhibits attached to his amended complaint, recommending his placement in cell housing, prison staff fail to adhere to the medical recommendation because, for example, CMF housing sergeants, defendants Murray and Thomas, construe the recommendation as a suggestion rather than a mandate.  Motion, pp. 1-2.  In his last prison grievance on the subject (Exhs. 35A-35S), plaintiff raised three medical issues: 1) his "severe neuropathy"; 2) his "bowel and bladder control" problem; and 3) his need for tinted windows at the first level.  Motion, p. 3, Exh. 35K, p. 37.  While at the second level, plaintiff did not raise these issues in precisely the same manner, he did aver that his present dorm housing was causing him pain and suffering and referenced how it is likely to lead to future injury.  Id., Exhs. 35P & 35Q, pp. 42-43.[7]

Defendants' response focused only on plaintiff's ambulatory condition in appeal responses without regard to his other medical needs and suffering.  Motion, pp. 3-4.  Plaintiff is forced to suffer daily headaches, which become severe migraines several times a week; he is

---

[7] In the third level appeal denial, Exh. 35R, the court's review reveals the following statement included among the findings: "It is not appropriate for the appellant to self-diagnose his medical problems and expect a physician to implement his recommended course of treatment; in this case the appellant's desire for celled housing is considered a medical recommendation rather than a medical necessity."

1    forced to endure intense pain while waiting for access to the toilet twice to four times a day; he

2    suffers anxiety anticipating every day that he is likely to incur injury from falling each time he

3    gets out of bed.  Motion, p. 5.  Exhs. 38A, 38B, and 38C demonstrate that he was cut off of his

4    prescription for Zolmitripan, which he needed after he was moved to dorm housing on December

5    17, 2004, whereupon he was exposed to light, triggering his migraine headaches.  Plaintiff

6    further contends that although Exh. 38B states that he was given a dose of Zolmitripan on

7    January 14, 2005, this did not occur because the MTA did not return with the promised dose.

8    Motion, p. 6 & plaintiff's affidavit.[8]

9            Plaintiff once again chronicles, as he does in his amended complaint, his futile

10    efforts to obtain cell housing, tinted windows and immediate toilet access; he emphasizes that his

11    treating physician, non-defendant Dr. Capozzoli, was angry that his medical recommendation

12    was not followed, as supported by exhibits both to his motion (Exh. 35 P, p. 42, and his amended

13    complaint, Exh. 32).  Motion, pp. 7-13.   He states that he must take insulin twice daily, requiring

14    that he eat no matter how he feels and that a migraine headache makes every move, whether to

15    the clinic for treatment or for a necessary meal, a painful ordeal.  Motion, plaintiff's dec., p. 17.

16    Plaintiff avers that he has done all he could to alleviate his pain and suffering within CMF, citing

17    Exhs. 35A - 35S, pp. 27-45 to the motion, his various grievances and the responses regarding his

18    multiple medical issues.   He sought and obtained renewal of his CDC-128-C chrono for dark

19    glasses and window tint, Exh. 36, p. 47, dated February 16-17, 2006, effective through February

20    15, 2007; on May 11, 2006, a work order request for tinted outside windows for his dorm per the

21    chrono was generated (Motion, p. 8 & Exh. 37, p. 49).  However, plaintiff asserts that

22    maintenance responded that there would be no way to install window tint in the dorms because of

23    _____

24          [8] The court notes here that although plaintiff claims to have been cut off from Zolmitripan
      from December 17, 2004, until February 1, 2005, which he needed to alleviate his migraines due
      to the light exposure, while such a claim may be a proper basis for seeking money damages in the

25    amended complaint, it is not the appropriate subject for a motion for preliminary injunctive relief
      because it has been mooted since plaintiff does not contend that he has been deprived of the

26    medication since February 1, 2005.

                                                7

a security issue based on a recent hostage incident, although window tinting is available in cells. Motion, p. 8.  Plaintiff states that defendants have a long history of deliberate indifference to his medical needs and that his having almost lost his balance has been witnessed.  Motion, p. 9, citing an affidavit by inmate Dennis Rodriguez, attached to his motion.  His migraines have been so severe that he could not even ask for help on occasion.  Motion, p. 9.  Plaintiff avers that he has met the requisite criteria for obtaining preliminary injunctive relief.

Defendants' Response

In their November 28, 2006, response, defendants concede that plaintiff, incarcerated at CMF since 1989, is a Type 1 brittle diabetic (and has been since the age of 12), who has developed other medical conditions, including diabetic retinopathy, photophobia, neuropathy, bowel and bladder issues.  Response, p. 2.  Moreover, defendants state that since 1998, plaintiff has been classified as permanently mobility impaired in his lower extremities; they aver that this means that he cannot walk up a flight of stairs or more than a hundred yards without walking aids.  Response, p. 2 & attachment 1 to defendant Bick's Dec., CDC Form 1845.

Defendant Bick concedes that plaintiff's medical conditions "are all medical conditions that substantially limit plaintiff's major life activities and are therefore defined as a serious medical need pursuant to the Americans with Disabilities Act."  Response, Bick Dec., ¶ 8.

In 2000, defendants agree that plaintiff received various medical chronos, attaching as Exh. 1 to their response, the same chronos plaintiff has attached to his motion.  Motion, p. 2 & Exh. 1.  These chronos recommended walking aids, such as crutches, a cane and a walker.

In August of 2004, following a recommendation that plaintiff be provided lower bunk housing on a lower tier because of his medical conditions, he was moved from a cell to dorm housing in December, 2004.  Motion, p. 2, Exh. 1, Attachment 2, citing also plaintiff's affidavit in support of his motion.  In February 2005, defendants state that it was recommended

8

that plaintiff be provided dark sunglasses and, if he were in a cell, that window tint be provided.
Response, p. 2.  Defendants emphasize that in May, 2005, CMF physicians recommended
plaintiff's placement in a cell rather than in a dorm due to his medical conditions, subject to
custodial and institutional safety requirements.  Response, p. 3.  Thus, defendants do not dispute
that plaintiff has serious medical conditions; nor do they contest that CMF doctors have made the
medical recommendation for cell housing for plaintiff and, indeed, that cell housing may well be
preferable for plaintiff, but rest their failure to provide cell housing on the argument that plaintiff
seeks to implement the medical recommendation, regardless of the prison's security concerns.
Response, pp. 3, 5, 7.  Defendants contend that CMF houses both higher security risk inmates,
designated Close B custody inmates, and medium security-risk inmates, designated as Medium A
custody inmates, and that, under CAL. CODE REGS. tit.xv, § 3377.1,[9] Medium A custody inmates
may be housed in dormitories.  Response, p. 6.  They state further in their response at page 6:

> The cells at CMF are fully occupied by Close B Custody Inmates
> leaving no cells available to accommodate Plaintiff, a medium
> security inmate.  To this end, the institution is unable to implement
> the medical recommendation without potentially placing a Close B
> Custody inmate in a dorm setting in violation of prison regulation.

Defendants include no affidavit in support of the bare and somewhat equivocal
statement that there exists a potentiality for having to place a higher security inmate in a dorm
setting if plaintiff's medical needs are met by placing him in a cell.  This begs the question that if
in fact there are no cells available to accommodate plaintiff because all are "fully occupied" by
higher custody level inmates, how there is only a potential, rather than a certainty, that a cell
move for plaintiff would necessitate placement of a Close B custody inmate in dorm housing.
(No declaration or further averment beyond argument supports the contention that all the cells are
filled with higher custody inmates either).

---

[9] Under CAL. CODE REGS. tit.xv, § 3377.1(a)(4), housing for male Close B custody inmates
"shall be in cells within designated institutions in housing units located within an established
facility security perimeter."  Pursuant to § 3371.1(a)(6), housing for Medium A custody inmates
"shall be in cells or dormitories within the facility security perimeter."

1    Defendant Bick asserts, inter alia, the following:

2    There is an internal process for an inmate to request a bed move to
     accommodate medical needs.  To do so, an inmate can submit a
3    sick call request to see a physician.  During this appointment, the
     inmate should articulate to the physician the medical necessity that
4    would justify different housing accommodations.  This
     recommendation would then be reviewed by the CMO for final
5    approval and sent back to Custody staff for implementation.

6    It is my medical opinion that Mr. Stringham would be a potential
     candidate, depending on the current circumstances and resources
7    available, for housing in the dorms that satisfy all requirements of
     the Americans with Disabilities Act.  In comparison with a
8    standard twelve-person dorm, this type of housing would provide
     additional restroom accommodation, as well as handle bars and
9    wider aisles for navigation.

10   Based on a review of the pertinent records, it is my medical
     opinion that there has been no medical necessity established for
11   Mr. Stringham to be housed in a cell with window tint.  Although
     it may be recommended for Mr. Stringham for convenience
12   purposes, cell-based housing is not medically necessitated to
     reasonably accommodate his medical conditions, and is subject to
13   custody and institutional safety requirements.

14   Response, Bick Dec., ¶¶ 9-11.

15          Based on defendant Bick's own assessment that plaintiff is ADA qualified and

16   given his own medical evaluation of the plaintiff's serious medical conditions, as well as copies

17   of plaintiff's litany of medical chronos which this defendant attaches to his own declaration, as

18   well as plaintiff's evidence of having sought reasonable accommodation, the court is somewhat

19   at a loss to understand why, at the least, plaintiff is not already housed in a dorm that provides

20   "additional restroom accommodation, as well as handle bars and wider aisles for navigation."

21   And, although this defendant references security concerns as the basis for determining plaintiff

22   cannot be accommodated by cell housing, he provides no specific information whatever as to

23   how those concerns are actually implicated, merely making a generic statement that plaintiff's

24   medical need for cell housing must be balanced against institutional safety concerns.

25          Defendant Bick states that it is his medical opinion that plaintiff's diabetic

26   retinopathy and photophobia can be adequately addressed by "board-certified, opthalmologist-

                                                 10

Case 2:05-cv-00644-FCD-GGH   Document 38   Filed 01/08/07   Page 11 of 22

recommended, CMF-approved dark glasses..." [as] "a superior means of protection from light sources than window tint."  Bick Dec. ¶ 5.  He goes on to declare that since the facility must be lit for security reasons, that window tint will not protect plaintiff's eyes outside his housing (assuming his placement in a window tinted cell, the court infers).  He also states that window tinting limits custody staff's ability to view a cell interior which implicates safety concerns as well.  Defendant Bick does not address how such safety concerns were apparently not at issue when plaintiff was accommodated with window-tinted cell housing prior to March of 2004, nor does he speak to the issue raised by plaintiff that the dark glasses cannot be properly placed over his prescription glasses or the reason as to why such dark glasses are not prescription glasses.

Reply[10]

In his December 13, 2006, reply, plaintiff avers that defendants have not updated his medical history in that their reference to "neuropathy" has now become a condition known as "severe sensorimotor polyneuropathy," signifying that plaintiff's feet and ankles are now completely numb, causing him to lose his balance repeatedly.  Reply, p. 2.  Plaintiff further asserts that defendants have admitted that plaintiff is supposed to be housed on the lower or first floor, but instead was first moved to the third floor, then to the first and is now currently on the third floor.  Id.  Plaintiff takes issue with defendants' contention that plaintiff's being allowed to live in a cell is conditioned on custodial and institutional safety requirements.  Reply, pp. 2-3.  Plaintiff contends none of the CDC-128-C medical chronos from or approved by defendant CMO Andreason contained any such caveat and that only defendant Bick added this express condition.  Reply, p. 3.

---

[10] Plaintiff has very recently submitted a document entitled an "Addendum to plaintiff's opposition to defendants' response to plaintiff's motion for a preliminary injunction," filed on December 20, 2006, by which plaintiff seeks to incorporate some recently received interrogatory responses by defendant Bick.  Although not explicitly contemplated by the rules of motion practice in the Federal Rules of Civil Procedure or by the Local Rules, the court has reviewed the filing and finds it to not to offer additional significant, substantive or enlightening information beyond what has already been provided to the court for the purposes of adjudicating the pending motion.  The undersigned, therefore, does not rely on this late filing.

11

1    Plaintiff claims that defendants "commit perjury" (defendant Bick in particular)

2  by stating that plaintiff is seeking to implement a medical recommendation regardless of the

3  security concerns of the institution.  Reply, p. 3, Bick Dec.  Rather, plaintiff states, window tint is

4  approved for prisoners such as plaintiff by staff.  Id., AC, Exhs. 13-14.  While earlier exhibits

5  were written in 2000, Exh. 37 to the AC, written in May of 2006, shows that security concerns

6  were not at issue as late as at that time.  Id.

7    Plaintiff notes that in his affidavit, defendant Bick declares that the dark glasses

8  plaintiff is provided are a superior form of protection from light than is window tint because

9  window tint cannot protect plaintiff's eyes from light outside his housing area.  Reply, p. 6.

10  However, plaintiff contends that plaintiff has no job assignment and must keep his right foot

11  elevated to the level of his heart most of the day and remains in his bed except for the time he

12  goes to shower, eat or for a medical appointment.  Id.  Because he is bed-ridden, plaintiff has no

13  use for the non-prescription dark glasses he cannot see through.  Id.

14    Plaintiff concedes that he is able to walk up to 100 feet (although the inmate

15  disability verification form attached to defendant Bick's dec., finding plaintiff permanently

16  mobility impaired in the lower extremities states as a condition that a person cannot walk 100

17  yards, not feet) without use of walking aids, he maintains that he nevertheless needs handholds or

18  handrails, which are provided in a cell, to keep his balance.  Reply, pp. 6-7.  To defendants'

19  argument that plaintiff is a medium custody inmate and that higher risk inmates are housed in

20  cells for facility security (defendants' response, p. 6), plaintiff avers that a number of medium

21  custody inmates are housed in cells.  Reply, p. 7.  He states that CMF would not pass an audit

22  based on defendants' contention that all cells contain higher custody inmates because critical

23  workers of medium custody are in cells and some life term inmates of medium custody are

24  placed in single cells with HIV/AIDS inmates if they so choose.  Id.  This latter point is rendered

25  moot, however, by plaintiff's concession that he, as a lifer, does not choose the HIV unit because

26  of the exposure he would have to "homosexual behaviors" which he contends occurs in the

1    common areas of that unit.  Id.

2            Plaintiff also argues that window tint does not pose a safety risk due to cells

3    having multiple light sources controlled by light switches, many of which are outside the cell;

4    that all cell and dorm lights can be turned on in the office of the housing officer; that even unlit

5    areas like the back of a locker can be searched with a flashlight.  Reply, p. 8.  This is why,

6    plaintiff contends, custody staff requested window tint, in conjunction with the CDC-128-C

7    medical chronos.  Id.

8    Preliminary Injunction Standard

9            The legal principles applicable to a request for preliminary injunctive relief are

10   well established.  "The traditional equitable criteria for granting preliminary injunctive relief are:

11   1) a strong likelihood of success on the merits, 2) the possibility of irreparable injury to plaintiff

12   if the preliminary relief is not granted, 3) a balance of hardships favoring the plaintiff, and 4)

13   advancement of the public interest (in certain cases)."  Dollar Rent A Car v. Travelers Indem.

14   Co., 774 F.2d 1371, 1374 (9th Cir. 1985).  The criteria are traditionally treated as alternative

15   tests.  "Alternatively, a court may issue a preliminary injunction if the moving party demonstrates

16   'either a combination of probable success on the merits and the possibility of irreparable injury or

17   that serious questions are raised and the balance of hardships tips sharply in his favor.'"  Martin

18   v. International Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984) (quoting William Inglis &

19   Sons Baking Co. v. ITT Continental Baking Co., 526 F.2d 86, 88 (9th Cir. 1975)).  The Ninth

20   Circuit has reiterated that under either formulation of the principles, if the probability of success

21   on the merits is low, preliminary injunctive relief should be denied:

22              Martin explicitly teaches that "[u]nder this last part of the
             alternative test, even if the balance of hardships tips decidedly in
23              favor of the moving party, it must be shown as an irreducible
             minimum that there is a fair chance of success on the merits."

24

25   Johnson v. California State Bd. of Accountancy, 72 F.3d 1427, 1430 (9th Cir. 1995) (quoting

26   Martin, 740 F.2d at 675).

1     In cases brought by prisoners involving conditions of confinement, any

2     preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the

3     harm the court finds requires preliminary relief, and be the least intrusive means necessary to

4     correct the harm."  18 U.S.C. § 3626(a)(2).

5     Discussion

6          Defendants argue that plaintiff must meet a heightened standard because he seeks

7     a mandatory, rather than a prohibitory, injunction, citing Stanley v. University of Southern

8     California, 13 F.3d 1313, 1320 (9th Cir. 1994) (district court should deny mandatory preliminary

9     injunctive relief "unless the facts and law clearly favor the moving party"); Dahl v. HEM

10    Pharmaceuticals Corp., 7 F.3d 1399, 1403 (9th Cir. 1993) (mandatory preliminary injunctive

11    relief is subject to heightened scrutiny); Anderson v. U.S., 612 F.2d 1112, 1114 (9th Cir. 1979) (a

12    mandatory injunction "goes well beyond simply maintaining the status quo pendente lite" by

13    requiring an affirmative act and "is particularly disfavored.")  Response, p. 3.  Defendants

14    contend that plaintiff's motion should not be granted unless he clearly demonstrates that

15    defendants were deliberately indifferent to his serious medical needs.  Id., at 4.

16         The circumstances of two of the cases defendants cite, however, do not speak to

17    the situation before this court in this case.  In Anderson, supra, at 1115, the Ninth Circuit noted

18    that mandatory injunctions "are not granted unless extreme or very serious damage will result

19    and are not issued in doubtful cases or where the injury complained of is capable of

20    compensation in damages."   In Anderson, the appeals court reversed both a mandatory and a

21    prohibitory injunction imposed on the U.S. Air Force by the district court.  As to the mandatory

22    injunction, plaintiff's claim of discrimination in not being hired for a particular job could be

23    adequately compensated by retroactive promotion and back pay in the future, while enjoining the

24    Air Force to hire her prior to adjudication of the merits was an internal interference imposed by

25    the court on facts and law not clearly favoring plaintiff's position, constituting an abuse of

26    discretion.  Id.  In Stanley, supra, the plaintiff's claims centered around claims of sex

14

discrimination and retaliation; the plaintiff sought a mandatory preliminary injunction requiring

that she be placed in a position as head coach of the USC women's basketball team, pending the

outcome of her lawsuit.  Again, her remedy at law in the form of money damages and back pay

was deemed adequate (although the court did go on to find that plaintiff had failed to

demonstrate that she would prevail against USC on the merits of her claim of denial of equal pay

for equal work in the negotiations for a new employment contract).

In Dahl, supra, the case most nearly analogous to the circumstances of the instant

matter in that the subject of physical health was at issue, the Ninth Circuit upheld a mandatory

injunction granted by the district court.  Eighteen patients who had chronic fatigue syndrome

participated in an experimental program to test a new medication supplied by defendant.  At the

end of the test period embarked upon so that FDA approval of the drug could be obtained, the

defendant pharmaceutical corporation stopped providing the medication and the patients sued for

injunctive and other relief, claiming the defendant had promised to continue providing the drug

after the study concluded if its effectiveness was demonstrated.  Dahl, supra, 7 F.3d at 1401.  The

district court granted the plaintiff's motion for a mandatory preliminary injunction, even in light

of the heightened standard required for such relief, mandating that defendant provide the drug to

the plaintiffs for an additional twelve months after the study's conclusion.  The Ninth Circuit

affirmed the district court's holding that defendant was in civil contempt for failing to provide

the drug for the additional period.  Id.

Likelihood of Success on the Merits

ADA Standard

Defendants make the error of applying only the legal standard for an Eighth

Amendment claim in their argument that plaintiff does not meet the requisite burden to obtain a

mandatory preliminary injunction, failing to take into account that plaintiff also makes his claims

based on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131-34.  Title II of the ADA

prohibits discrimination on the basis of disability.  Lovell v. Chandler, 303 F.3d 1039, 1052 (9th

1    Cir. 2002).  Title II of the ADA applies to inmates in state prison.  <u>Armstrong v. Wilson</u>, 124

2    F.3d 1019, 1023, 1025 (9th Cir. 1997).

3            Subject to the provisions of this subchapter, no qualified individual
             with a disability shall, by reason of such disability, be excluded

4            from participation in or be denied the benefits of the services,
             programs or activities of a public entity, or be subjected to

5            discrimination by any such entity.

6    42 U.S.C. § 12132.

7            In order to state a claim of disability discrimination under Title II of the ADA

8    plaintiff must allege four elements:  1) he is an individual with a disability; 2) he is otherwise

9    qualified to participate or receive the benefit of some public entity's services, programs, or

10   activities; 3) he was either excluded from participation in or denied the benefits of the public

11   entity's services...or was otherwise discriminated against by the public entity; and 4) such

12   exclusion, denial...or discrimination was by reason of his disability."  <u>McGary v. City of</u>

13   <u>Portland</u>, 386 F.3d 1259, 1265 (9th Cir. 2004); <u>see also</u>, <u>Townsend v. Quasim</u>, 328 F.3d 511, 516

14   (9th Cir. 2003); <u>Duffy v. Riveland</u>, 98 F.3d 447, 455 (9th Cir. 1996).

15           As noted earlier, defendants confirm that plaintiff is ADA-qualified.  As to

16   whether or not plaintiff has made a showing that he has been excluded from participation in

17   services, programs, or activities:

18           A disability discrimination claim may be brought either on the
             theory that defendant failed to make reasonable accommodations

19           or on a more conventional disparate treatment theory, or both.
             This is because the ADA not only protects against disparate

20           treatment, it also creates an affirmative duty in some circumstances
             to provide special, preferred treatment, or "reasonable

21           accommodation."

22   <u>Dunlap v. Association of Bay Area Governments</u>, 996 F. Supp. 962, 965 (N.D. Cal. 1998).<sup>11</sup>

23           Speaking specifically to claims under Title II of the ADA, the

24   Ninth Circuit has made clear that "Congress intended to prohibit two different phenomena.

25

26       <sup>11</sup> Although <u>Dunlap</u>, <u>supra</u>, considers specifically Title III of the ADA, <u>McGary v. City of</u>
     <u>Portland</u>, 386 F.3d 1259, 1266 (9th Cir. 2004), cites this case in the context of a Title II claim.

1   Congress intended to prohibit outright discrimination, as well as those forms of discrimination

2   which deny disabled persons public services disproportionately due to their disability."  Crowder

3   v. Kitagawa, 81 F.3d 1480, 1483 (9th Cir. 1996).  Addressing a class action brought pursuant

4   to Title II of the ADA, the Ninth Circuit has stated:

5               When a state's policies discriminate against the disabled in
            violation of the ADA, the ADA's regulations mandate reasonable
6           modifications to those policies in order to avoid discrimination on
            the basis of disability, at least when such modification would not
7           fundamentally alter the nature of the services provided by the state.

8   Townsend, supra, 328 F.3d at 517 (citations omitted).

9               Defendants do not dispute, indeed they do not even address the question of

10  whether plaintiff makes out a claim that defendants have failed to make reasonable

11  accommodations for him in light of his disabilities.  This court finds that such a claim is stated.

12              In this motion seeking preliminary injunctive relief, the applicable standard for

13  review in applying the rights conferred under an ADA claim in the context of a prison is

14  "equivalent to the review of constitutional rights in a prison setting, as outlined by the Supreme

15  Court in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 [] (1987)."  Gates v. Rowland, 39 F.3d

16  1439, 1447 (9th Cir. 1994), quoting Turner, supra, at 89, 107 S. Ct. 2261 ("when a prison

17  regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

18  related to legitimate penological interests.")

19              Under Turner, four factors are applied to determine whether a prison regulation

20  permissibly impinges on a prisoner's constitutional rights.

21              First, there must be a valid, rational connection between the prison
            regulation and the legitimate governmental interest put forward to
22          justify it, and the governmental objective itself must be a legitimate
            and neutral one.  A second consideration is whether alternative
23          means of exercising the right on which the regulation impinges
            remains open to prison inmates.  A third consideration is the
24          impact accommodation of the asserted right will have on guards,
            other inmates, and the allocation of prison resources.  Finally, the
25          absence of ready alternatives is evidence of the reasonableness of a
            prison regulation.
26

                                        17

1  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91, 107 S. Ct.

2  2254).

3           As to the first factor, the issue is whether there is a valid and rational connection

4  between the prison staff's placement of plaintiff in a third floor dorm, where plaintiff states that

5  he is now housed and which defendants do not dispute, and the prison's very generally expressed

6  safety and security concerns.  While the burden is on inmates to show that a challenged

7  regulation, or in this case, housing placement, is unreasonable under Turner, defendants must

8  present a legitimate government interest "and provide some evidence that the interest put forward

9  is the actual reason for the regulations."  Casey v. Lewis, 4 F.3d 1516, 1520-21 (9th Cir. 1993).

10  On this showing by defendants, the validity of the connection does not appear to be sustainable,

11  notwithstanding the deference due to prison administrators in the running of prisons for several

12  reasons.

13           Defendants do not set forth any reason why plaintiff must be on the third floor,

14  rather than a first floor dorm, where in fact he was apparently recently housed.  Defendants do

15  not provide any affidavit or declaration which provides any specificity as to how safety and

16  security are implicated by placing plaintiff on the first floor.  Further, defendants do not even

17  adequately support a claim that moving plaintiff from window-tinted cell housing protects prison

18  security when it is medically recommended, which arguably means prescribed, by at least one

19  prison doctor and has even been recommended by defendant Bick, albeit he emphasizes that the

20  recommendation is subject to safety concerns.  How is it that cell-housing is no longer feasible

21  when it had evidently been consistently provided for several years prior to 2004?  Beyond

22  counsel's argument, there is no support provided for contention that higher level custody inmates

23  are occupying all the cells; thus, the placement of plaintiff in a third floor dorm appears arbitrary,

24  rather than neutral and legitimate.

25           As to the second factor, it is evident that restricting plaintiff to a third floor dorm

26  not, for example, outfitted with handlebars to help him maintain his balance or with easier access

18

to bathroom and eating facilities does not afford him adequate alternative means of accommodating his multiple medical conditions.  It is possible that, unwieldy as they may be, the non-prescription dark glasses might be an adequate alternative to window tinting, if defendants had made any substantive showing that security concerns are implicated should plaintiff be placed in a cell.

Because defendants have not been convincing with regard to the first factor, they can make little showing that placing plaintiff in a window tinted cell or in a dorm environment better equipped to deal with plaintiff's mobility issues will have any significant impact on fellow inmates or prison staff.

Finally, as to the fourth factor, whether there is an absence of ready alternatives evidencing the reasonableness of plaintiff's current housing, defendants fall short here as well. Under Turner, supra, at 90, 107 S. Ct. at 2262, "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns."  In this case, defendant Bick, himself, has suggested that plaintiff may be a candidate for housing in dorms that satisfy ADA requirements, providing additional restroom facilities, as well as handle bars and wider aisles to navigate.  See Bick Dec., ¶ 10.  Where defendants themselves recognize at least one ready alternative more than suggests that the current placement is an "exaggerated response."

As set forth above, defendants confirm that plaintiff suffers from myriad serious medical conditions.  They do not dispute that until March of 2004, plaintiff was provided with cell housing with window tinting.  Defendants do not contend that plaintiff's serious medical condition has any chance of ameliorating.  Plaintiff has submitted evidence that his treating physician has continued to make a medical recommendation of his need for window tinting. Defendants, including a defendant physician, have explicitly conceded that plaintiff, incarcerated at CMF since 1989, has been a Type 1 brittle diabetic since his youth, who has developed other serious medical conditions, including diabetic retinopathy, photophobia, neuropathy, bowel and

1  bladder issues.  Defendant Bick affirms that since 1998, plaintiff has been classified as

2  permanently mobility impaired in his lower extremities, averring that this means that he cannot

3  walk up a flight of stairs or more than a hundred yards without walking aids.  Defendant Bick, as

4  previously noted, concedes that plaintiff's medical conditions "are all medical conditions that

5  substantially limit plaintiff's major life activities and are therefore defined as a serious medical

6  need pursuant to the Americans with Disabilities Act."  Defendant Bick even suggests that

7  plaintiff could pursue dorm housing that accommodates individuals who, like plaintiff, qualify as

8  disabled under the ADA.  What defendants do not do is make any adequate showing as to why

9  plaintiff has not been placed in such dorm housing that would better accommodate his

10  disabilities, why plaintiff who for several years was allowed cell housing with window tinting for

11  his diabetes-related retinopathy and photophobia has been removed from such housing, when his

12  medical condition is unlikely to have improved over those years, and, indeed, is likely to have

13  deteriorated.   The court finds that plaintiff has made a sufficient showing of likelihood of

14  success on the merits in this matter.

15  Irreparable Harm

16         Plaintiff's showing with regard to the migraines that he continues to suffer in the

17  face of the light to which he is exposed, with respect to the inadequacy of the dark glasses he is

18  provided or has access to, with respect to his need to access bathroom facilities from dorm

19  housing without built-in devices to aid his balance as he walks; and with regard to his need for

20  such assistance in obtaining the meals he must eat to be able to inject insulin twice a day clearly

21  demonstrates that he is subject to irreparable harm without some remedy during the pendency of

22  this litigation.

23  Balance of Hardships

24         Defendants make an inadequate showing to support their claim that providing

25  plaintiff with window tinted cell housing, which, in any event, need not be single cell housing,

26  would implicate prison safety or security, as previously noted.  Nor do they demonstrate how his

1  current dorm housing adequately takes into account his serious medical needs in light of the

2  finding that he is permanently mobility impaired in his lower extremities.  The showing does not

3  go the requisite distance to tip the balance of hardships in their favor.

4  Conclusion

5           This court finds that plaintiff has met the heightened standard with respect to a

6  mandatory preliminary injunction, that defendants have failed to dispute the essential facts

7  plaintiff has set forth, and that the issuance of a mandatory injunction in this case does not place

8  an onerous burden upon defendants.  Defendant Bick himself suggests in his affidavit that dorm

9  housing that meets ADA requirements might be suitable for plaintiff, although he does not make

10 clear why plaintiff has not been provided such since his placement in dorm housing.  The court

11 would recommend that the motion be granted only to the extent that plaintiff be moved to such

12 dorm housing in the interest of granting only the most narrowly drawn relief sought by the

13 motion, but defendants have not shown that simply addressing plaintiff's mobility needs

14 adequately answers the issues plaintiff has raised with respect to his medical need for window

15 tinting and have not provided an adequate basis to justify plaintiff's having been removed from

16 window tinted cell housing, making the move appear arbitrary, particularly in the face of

17 plaintiff's serious medical needs which appear to be advancing rather than ameliorating with

18 time.

19          Accordingly, IT IS HEREBY RECOMMENDED that plaintiff's May 25, 2006,

20 "emergency" motion for a preliminary injunction be GRANTED, and defendants be enjoined to

21 place plaintiff in window tinted cell housing within 30 days of adoption of these findings and

22 recommendations, should that occur.

23          These findings and recommendations are submitted to the United States District

24 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

25 days after being served with these findings and recommendations, plaintiff may file written

26 objections with the court.  Such a document should be captioned "Objections to Magistrate

1   Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections

2   within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v.</u>

3   <u>Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4   DATED: 1/8/07                                    /s/ Gregory G. Hollows

5                                                    _____
                                                     UNITED STATES MAGISTRATE JUDGE
    GGH:009
6   stri0664.pi

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26